James ARTHUR, M.D., Allan C. Gocio, M.D., Hot Springs
Neurosurgery Clinic, P.A., St. Joseph's Regional Health
Center, Inc., Calcitek, Inc., Sisters of Mercy Medical Systems,
Sisters of Mercy Health System — St. Louis Pooled
Comprehensive Liability Agreement, and American Medical
International, Inc. d/b/a National Park Medical Center
*v.* Betty Jo ZEARLEY and Herman Zearley, Brad Cazort
and Sandra Partridge, as Administrators of the Estate of
Charlotte Phillips Cox, Deceased

94-1012 895 S.W.2d 928

Supreme Court of Arkansas
Opinion delivered April 10, 1995
[Rehearing denied May 15, 1995.*]

*Special Justices Ernie E. Wright and Bruce T. Bullion, join. Newbern, Glaze,
Brown, and Roaf, JJ., not participating.

*Friday, Eldredge & Clark*, by: *J. Philip Malcom, Robert S. Shafer*, and *Allison Graves*, for appellants James Arthur, M.D., Allan C. Gocio, M.D., Hot Springs Neurosurgery Clinic, P.A..

*Wright, Lindsey & Jennings*, by: *Edwin L. Lowther, Jr.*, for appellants St. Joseph's Regional Health Center, Inc. and Sisters of Mercy Health System.

*Mitchell, Williams, Selig, Gates & Woodyard*, by: *Lyn P. Pruitt* and *Rhonda M. Wheeler*, for appellant Calcitek, Inc.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Mike Huckabay* and *Tim Boone*, for appellant American Medical International, Inc. d/b/a National Park Medical Center.

*Hicks Law Firm*, by: *Charles R. Hicks, George R. Wise, Jr., Lamar Porter, Bob Davidson* and *George Ellis*, for appellees.

JACK HOLT, JR., Chief Justice. This is an interlocutory appeal from an order certifying a class action. Appellees Betty Jo Zearley and Herman Zearley successfully sought certification in circuit court of a variety of tort claims centered around medical malpractice arising out of the alleged improper surgical implantation, by Drs. James Arthur and Allan C. Gocio, of a product known as "Orthoblock" into the spines of several patients. Appellees Brad Cazort and Sandra Partridge, acting as administrators of the estate of Charlotte Phillips Cox, deceased, were permitted to intervene in the lawsuit and serve as additional class

representatives. We initially granted a temporary stay of the trial court's order certifying the class and requested the parties to file briefs. In examining the issues on their merits, we hold that the trial court abused its discretion in allowing the testimony of appellees' counsel at the hearing, and in certifying the cause as a class action.

The appellants are the physicians, their clinic, the hospitals where the surgeries took place, and the manufacturer of Orthoblock, who, together, make the following assignments of error: (1) that the trial court erred in certifying the class; (2) that the trial court erred in permitting class counsel to testify and act as advocate in the same proceeding; (3) that the trial court erred in failing to deny class certification when there were pending lawsuits arising out of the same transaction or occurrence; (4) that the trial court erred by adding additional class representatives; (5) that the trial court erred in ordering the hospitals to breach the physician-patient privilege by identifying non-Orthoblock patients; and (6) that the trial court erred in finding that venue was proper in Saline County. We hold that trial court abused its discretion in allowing the appellees' counsel to testify and acts as advocate in the same proceeding, and in certifying a class where individual issues predominated over common questions of law or fact. In so holding, it is unnecessary for us to address the remaining arguments, and we reverse and remand this case to the trial court with instructions to decertify the class.

## Facts

On June 24, 1993, Appellees Betty Jo Zearley and Herman Zearley filed a complaint in Saline County Circuit Court alleging medical negligence, battery, fraud, outrage, strict liability and breach of warranty arising out of the surgical implantation of a medical product called "Orthoblock" into Mrs. Zearley's spine. The Zearleys named as defendants Dr. James Arthur, who performed the surgery, Dr. Allan Gocio, who assisted in the procedure, their clinic, Hot Springs Neurosurgery Clinic, P.A. (together, the "physicians"), Calcitek, Inc. ("Calcitek"), the manufacturer of Orthoblock, and St. Joseph's Regional Health Center, Inc., ("St. Joseph's), where the procedure took place.

Approximately one year later, on June 9, 1994, the Zearleys amended their complaint to request certification of over 300

of the physicians' patients who had undergone similar surgeries involving Orthoblock, and added the Appellant American Medical International, Inc., d/b/a National Park Medical Center ("AMI"), where some of the patients' surgeries had taken place. In response, Calcitek argued that due to approximately 80 other actions filed in other counties arising out of the same circumstances, the Zearley's request for certification should be denied.

After a hearing at which the trial court allowed, over objection, testimony of Charles Hicks, one of the attorneys for the Zearleys and other parties seeking to become class representatives, it announced by letter opinion on July 7, 1994, its intention to certify a class against all defendants except AMI, who had not yet entered an appearance. Thereafter, the Zearleys filed a motion to approve notice to prospective class members and to add additional representatives. At a subsequent hearing on September 15, 1994, with AMI having entered an appearance, the trial court approved notice and allowed, over the objection of appellants, appellees Brad Cazort and Sandra Partridge, attorneys and administrators of the estate of Charlotte Phillips Cox[1], deceased, to intervene as parties plaintiff and to become additional class representatives. The trial court also ruled, over objection, that venue was proper in Saline County. It is from these adverse rulings that this appeal is taken.

## I. Attorney as witness and advocate

The physicians, in a position adopted by Calcitek, AMI, and St. Joseph's, allege that the trial court erred in allowing one of the attorneys representing the class, Charles Hicks, to testify and act as advocate at the July 7, 1994, class certification hearing. During this proceeding, Mr. Hicks took the witness stand and testified under oath while his associate, Mr. Porter, asked questions of him on direct examination. As the physicians assert in their brief, Mr. Hicks testified as to the characteristics of Orthoblock, commented on what medical X-rays showed, summarized the anecdotal complaints of his clients, described medical tools

---

[1]Ms. Cox, had a pending action against the physicians, Calcitek, and AMI at the time of her death. Her attorneys, Cazort and Partridge, testified at the September 15, 1994, hearing in support of their motion to intervene and to serve as class representatives, which the trial court granted in its entirety.

allegedly used to insert the Orthoblocks, offered his opinion on the expected length of trial and the adequacy of potential compensation, and concluded that there was "no question this is a mass injury situation." It was also through Mr. Hick's testimony that all of the appellees' exhibits were introduced. While Mr. Hicks was undoubtedly the primary witness at the hearing, Betty Zearley and Herman Zearley also offered testimony. The physicians objected to Mr. Hicks's testimony at the July 7, 1994, hearing, and again a post-hearing motion to reconsider and to disqualify him as counsel, both of which were overruled by the trial court. On appeal, Mr. Hicks asserts that he merely assisted the trial court with an analysis and evaluation of the proof, and was not actually a witness in the case.

■■ Model Rule of Professional Conduct 3.7 provides as follows:

A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

The general rule is clear and unmistakable. *A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.* The reasoning underlying the general rule is to prevent prejudice and a conflict of interest. The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Conversely, a witness is to tell the truth without loyalty to either party and without regard to which side his testimony might favor. Combining the dissimilar roles of attorney and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and his client. The court of appeals has written that:

There are several reasons for the general rule. First, because of interest or the appearance of interest in the outcome of the trial, the advocate who testifies at trial may be subject

to impeachment and the evidentiary effect of his testimony will be weakened, thus harming his client. Second, opposing counsel may be handicapped in cross-examining and arguing the credibility of trial counsel who also acts as a witness. Third, an advocate who becomes a witness may be in the unseemly position of arguing his own credibility. Fourth, the roles of advocate and witness are inconsistent and should not be assumed by one individual. Last, the attorney should not act as both trial counsel and a material witness because of the appearance of impropriety.

*Ford* v. *State*, 4 Ark. App. 135, 139, 628 S.W.2d 340, 342 (1982) (footnotes omitted).

 Our case law is equally clear. In *Enzor* v. *State*, 262 Ark. 545, 559 S.W.2d 148 (1977), in interpreting an earlier version of the same rule, we wrote:

The Arkansas Reports are replete with cases where this Court has registered its disapproval of an attorney testifying in an action in which he is an advocate. See: *Canal Insurance Company* v. *Hall*, 259 Ark. 797, 536 S.W.2d 702 (1976); *Watson* v. *Alford*, 255 Ark. 911, 503 S.W.2d 897 (1974).

In this action, one of the appellant's attorneys testified in behalf of appellant. We must again take this opportunity to reiterate strongly our disapproval of an attorney testifying in an action in which he is an advocate. An attorney who is to testify in an action should withdraw from the litigation. On the other hand, if an attorney is going to serve as an advocate for his client, he should refrain from testifying in the action.

*Id.* at 551, 559 S.W.2d at 151.

Other cases where we have made similar statements include the following: *Purtle* v. *McAdams*, 317 Ark. 499, 879 S.W.2d 401 (1994); *Burnette* v. *Morgan*, 303 Ark. 150, 794 S.W.2d 145 (1990); *Bishop* v. *Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983); *Boling* v. *Gibson*, 266 Ark. 310, 584 S.W.2d 14 (1979); *Jones* v. *Hardesty*, 261 Ark. 716, 551 S.W.2d 543 (1977); *Canal Ins. Co.* v. *Hall*, 259 Ark. 797, 536 S.W.2d 702 (1976); *Dingledine* v. *Dingledine*, 258 Ark. 204, 523 S.W.2d 189 (1975);

*McWilliams* v. *Tinder*, 256 Ark. 994, 511 S.W.2d 480 (1974); *Watson* v. *Alford*, 255 Ark. 911, 503 S.W.2d 897 (1974); *Montgomery* v. *First Nat'l Bank of Newport*, 246 Ark. 502, 439 S.W.2d 299 (1969); *Old American Life Ins. Co.* v. *Taylor*, 244 Ark. 709, 427 S.W.2d 23 (1968); *Rushton* v. *First Nat'l Bank of Magnolia*, 244 Ark. 503, 426 S.W.2d 378 (1968).

The exceptions to the general rule are equally clear. They are:

> (1) A lawyer can testify if the testimony relates solely to an uncontested matter; (2) A lawyer can testify to the nature and value of legal services rendered in the case by the lawyer or his firm to the client; (3) A lawyer can testify if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Not one of the three exceptions is applicable to the case before us. These three exceptions are the only ones provided by the rule. It is a settled rule of construction that when certain exceptions are specified in a rule, all others are excluded. The Latin maxim is *expressio unius est exclusio alterius.*

In the case before us, the trial court allowed Mr. Hicks's testimony on the basis that he had "testified in a hearing on dealing with a procedural consideration by the court." Accordingly, the appellees ask us to agree that because the class certification was "procedural," Mr. Hicks did not act as an "advocate at trial," and, as such, the general rule prohibiting an attorney from testifying is not applicable. In rejecting the appellees' argument, we recognize that there is no exception that allows an attorney to testify about the propriety of a class certification in a contested case, and note that the creation of such an exception would not be a legitimate construction of the rule. An attorney in our system of jurisprudence is to serve as an advocate and is to have complete loyalty, within the bounds of the law, to his client. The attorney so acted at the certification hearing. He testified on direct examination about the characteristics of Orthoblock; testified about what medical x-rays showed; summarized the anecdotal complaints of his clients; testified to the foundation for introduction of exhibits; testified about the medical tools used in the procedure; an even testified that there was "no question this is a

mass injury situation." The beginning of his cross-examination is abstracted as follows:

> I am the plaintiff's counsel on the record on all pleadings in these 80 cases. Mr. Porter, who's been asking me questions [on direct] is employed by my law firm . . .
>
> *I have a financial interest in all of this litigation . . .* that I'm testifying to as a witness. At this very moment I am testifying strictly as to factual issues and not acting as advocate. I did not renounce my contingency fee before I took that stand ... As I've testified *and put my credibility as issue from that witness stand,* I have still maintained an attorney/client relationship with the 80-something different litigants in the lawsuits. (Emphasis added.)

The issue was whether a class should be certified. The issue was fully, even bitterly, contested by all parties at the hearing. The record of the certification hearing contains ten volumes. The appeal to this court of the certification ruling contains one abstract, and eight briefs. Mr. Hicks engaged in full and complete advocacy, representing his known clients with all of his considerable ability. Aside from his clients' interests, he had something very close to a personal interest. He not only sought class certification, he also sought the identity of all possible clients who might become members of the class, as he asked for, and obtained, an order requiring the appellants to disclose the names, addresses, telephone numbers, and social security numbers of over three hundred other patients who had this same procedure so that they would become members of this lawsuit. The witness was advocating a class action with all of his ability. Under these circumstances, we hold that it was error to permit Mr. Hicks to testify and act as advocate in the same proceeding. In declaring that this ruling was in error, we acknowledge the trial judge's finding that he would have certified the class in the absence of Mr. Hicks's testimony. That being the case, we must now examine the remaining evidence to determine whether the trial court erred in certifying the class.

## II. Class certification requirements

We review questions of class certification under an abuse of discretion standard. *See Summons* v. *Missouri Pacific*

*Railroad*, 306 Ark. 116, 813 S.W.2d 240 (1991). Arkansas Rule of Civil Procedure 23(a) sets out the prerequisites to a class action:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*See also Summons* v. *Missouri Pac. R.R., supra.*

In addition to these prerequisites, the class action must also be maintainable under Rule 23(b), which states in pertinent part that:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*See also Lemarco Inc.* v. *Wood*, 305 Ark. 1, 804 S.W.2d 724 (1991).

The crux of the physicians' argument, which is again adopted by reference by Calcitek, AMI, and St. Joseph's, is that the issue of informed consent is foundational to the individual claims and cannot be tried on a class basis. We agree, and find persuasive the cases cited by the physicians in support of their argument. In *Harrigan* v. *United States*, 63 F.R.D. 402 (E.D.Pa. 1974), a paralyzed veteran alleged that he was negligently and fraudulently induced to submit to urinary tract surgery, and that he would not have consented to the surgery if he had been fully and correctly advised of the nature and consequences of the operation. In refusing Harrigan's request to represent a class of all paralyzed veterans who had undergone similar urological surgeries on the basis of allegedly similarly misleading information, the Pennsylvania district court recognized that the "thrust" of his complaint involved the issue of informed consent:

> The concept of informed consent is a complex one involving such issues as what information was supplied to each patient, what the emotional condition of each patient was, what each patient's understanding of the information conveyed was, and whether there was a necessity of dispensing with the requirement of informed consent due to emergency conditions. A determination of informed consent in each case depends upon a separate inquiry into the facts surrounding each operation and an application of the facts to the governing legal principles.

63 F.R.D. at 405.

The district court in *Harrigan* concluded that there were no common issues of fact or law. This decision was cited by the California Court of Appeal in *Brown* v. *Regents of University of California*, 151 Cal. App.3d 982, 198 Cal. Rptr. 916 (3d Dist. 1984), which held that individual issues substantially predominated over common questions where plaintiffs brought eleven claims including intentional concealment, misrepresentation, battery, and negligence, alleging that they were negligently and fraudulently induced to consent to coronary care and medical treatment at a university medical center. The plaintiffs in *Brown* sought to represent a class of similarly-situated patients who had died or had suffered injuries from their coronary care at a university hospital, yet the court refused to do so, recognizing that a number of areas required individual proof:

> Whether a particular class member relied on the representation, for example will require close scrutiny of what was said between a class member and his physician. A class member's particular medical condition and method of treatment must be examined in order to determine proximate cause of any claimed damage and the actual extent of such damage. All of the foregoing involve questions of what is medically appropriate for a particular patient under his particular circumstances . . .

> . . . [T]he court must grapple with complex issues relating to a patient's medical condition prior to surgery, the need for medical care and the extent of such care required by his condition, the variable nature of the dialogue between

physician and patient, the surgical process itself, and post-surgical complications and care.

198 Cal. Rptr. at 920.

In their brief, the appellees argue that the cases cited by the physicians involved the sole issue of informed consent, while the use of Orthoblock in the surgeries here provides the "common link." They argue that because the use of this product itself was experimental in that it was not approved by the FDA for use in spinal surgeries, the physicians breached their duty to obtain informed consent by failing to use the word "experimental" in patient conferences. We do not find this argument persuasive, for the appellees are in no position to know what was said in the physicians' oral conferences with other patients, as Dr. Arthur, in his deposition stated that each of the communications with the Orthoblocks were oral and not written. The appellees' argument is further weakened by their own complaints, as the issue of informed consent is woven throughout their claims for negligence, battery, tort of outrage, and fraud or fraudulent concealment.

In support of their position that the requirements of commonality and predominance have not been met, the physicians refer to Ark. Code Ann. § 16-114-206 (1987), which sets out the burden of proof for a plaintiff in an action for medical injury, as well as a framework for considering the issue of informed consent in subsection (b), which states, in pertinent part, as follows:

> (b)(1) Without limiting the applicability of subsection (a) of this section, where the plaintiff claims that a medical care provider failed to supply adequate information to obtain the informed consent of the injured person, the plaintiff shall have the burden of proving that the treatment, procedure, or surgery was performed in other than an emergency situation and that the medical care provider did not supply that type of information regarding the treatment, procedure, or surgery as would customarily have been given to a patient in the position of the injured person or other persons authorized to give consent for such a patient by other medical care providers with similar training and experience *at the time of the treatment*, procedure, or surgery in the locality in which the medical care provider practices or in a similar locality.

(2) In determining whether the plaintiff has satisfied the requirements of subdivision (b)(1) of this section, the following matters shall also be considered as material issues:

(A) Whether a person of ordinary intelligence and awareness in a *position similar to that of the injured person or persons* giving consent on his behalf could reasonably be expected to know of the risks or hazards inherent in such treatment, procedure, or surgery;

(B) *Whether the injured party or the person giving consent* knew of the risks or hazards inherent in such treatment, procedure or surgery;

(C) *Whether the injured party would have undergone the treatment, procedure, or surgery regardless of the risk involved* or whether he did not wish to be informed thereof;

(D) Whether it was reasonable for the medical care provider to limit disclosure of information because such disclosure could be expected to adversely and substantially affect the *injured person's condition.*

(Emphasis added.)

In accordance with this statute, the jury will be called upon to assess several factors which will vary with each individual plaintiff, including the "position of the injured person" under section (b)(2)(A), as each patient will have a unique medical history and condition, diagnosis, and treatment plan. The complaints presented to the trial court indicate that while some patients had Orthoblock inserted at one level of the vertebrae, others had the device inserted at two or three levels. The Orthoblock was also used in different sizes and was shaped to fit the patient as part of the surgical procedure, and while some patients had repeat surgeries, others, including Mrs. Zearley, had the Orthoblock removed.

It is also significant that the type of information that would customarily be given "at the time of treatment" under section (b)(1) will also vary from patient to patient. According to the deposition of Dr. Arthur, the Orthoblock surgeries were performed between November 1989 and January 1993. During this span of three years and two months, both the physicians' expe-

rience with the use of Orthoblocks and the available knowledge concerning cervical fusion surgeries were constantly changing, which affected the content of their disclosures to the patients and the applicable standard of care. For example, Dr. Arthur stated in his deposition that he offered one patient, Mr. Hall, three options regarding the materials which could be used in the fusion procedure: freeze-dried bone, bone from his hip, and Orthoblock. Dr. Arthur further explained how medical knowledge of HIV transmission via freeze-dried bone had changed since the time of Mr. Hall's surgery.

Referencing section (b)(2)(B), the knowledge of the patient or other person authorized to give consent will necessarily vary by virtue of prior experience and contact with other patients, and this difference will likely affect the finding of fact regarding the individual patient's appreciation of the risks and the adequacy of the disclosures that were made. Also at variance is whether the patient would have chosen the Orthoblock surgery regardless of the risk, or if he or she would have simply preferred not to be informed. The application of section (b)(2)(C) requires inquiry into all the circumstances surrounding each individual case, including the testimony and credibility of the patient, the distress of the patient's circumstances, and the jury's assessment of what transpired at the informed consent conference. Referring again to Dr. Arthur's deposition, the doctor related that Mr. Hall was in extreme pain when the Orthoblock procedure was discussed, and that Mr. Hall stated to him, "I don't care what you use in there; just make my arm quit hurting."

The ultimate trier of fact, in determining whether any limitation upon disclosure was reasonable in light of the patient's condition in section (b)(2)(D), will undoubtedly take into account the available alternatives to the particular patient, his or her prognosis for recovery, the degree of the patient's pain and suffering, the patient's emotional stability, and other individual medical or psychological factors. We cannot say, in the main, that these facts alone provide the requisite commonality which warrants the certification of a class. In sum, when applying Arkansas's informed consent statute to the facts in this case, it is clear that individual issues predominate over questions common to the members of the class on the issue of informed consent alone.

In addition to the facts surrounding informed consent, there are other issues which are uncommon to the class members. For instance, the issue of causation appears uncommon, such that even if the jury were to find that the physicians had not made a proper disclosure, such a failure and the resulting use of Orthoblock in surgery may not be the proximate cause of the patient's injury or loss; rather, other factors peculiar to the patient's medical condition may be the sole or proximate cause of damages. Moreover, the appellees' claims for breach of warranty against Calcitek are likewise uncommon and inappropriate for class treatment, for each individual claim alleges a breach of the warranties of fitness and merchantability which proximately resulted in damages. For these reasons, we see no need to further discuss the issue of breach of warranty. While Calcitek adopts by reference the physicians' argument on this point, it emphasizes in its brief that the individual claims for products liability are not suitable for class treatment as well. Calcitek cites the case of *Raye* v. *Medtronic Corp.*, 696 F. Supp. 1273 (D.Minn. 1988), in support of its position, in which a Minnesota district court, in a products liability action involving a pacemaker, reasoned as follows:

> This case is very similar to the cases cited by defendant in which courts refused to certify classes in actions alleging defective medical products. In those cases and in this case, there simply are not enough common questions of law or fact to justify use of the class mechanism. Issues which would need to be separately litigated with respect to each member include: causation, liability, and damages.

696 F. Supp. at 1275.

The rationale of the *Raye* decision is helpful in analyzing the facts before us, as here, Calcitek's potential liability could differ among the individual claims, as the actions of the physicians, St. Joseph's, and AMI as intermediaries will likely be at variance. As the California Court of Appeal stated in *Rose* v. *Medtronics, Inc.*, 107 Cal. App.3d 150, 166 Cal. Rptr. 16 (1980):

> Like any manufacturer of a potentially defective product, the defendant may face claimants with varying periods of use of the product, varying needs for its replacement, varying elements of causation, varying degrees of injury, and varying amounts of damages.

166 Cal.Rptr. at 20.

As the manufacturer of Orthoblock, Calcitek will face individual claimants who had the devices inserted at various levels of their spines over a three-year period, and who had varying needs for subsequent surgical procedures. As stated previously, the issue of informed consent will likewise vary from patient to patient, affecting the elements of causation, degree of injury, and damages.

■■■ Granted, when looking at the pleadings, there are common questions of law among the individuals seeking class certification, as all complaints allege the same legal theories of recovery — medical negligence, battery, fraud, outrage, strict liability and breach of warranty. We have said that under our Rule 23, a party seeking class certification has to show that there were common questions of law or fact. *See International Union of Elec., Radio & Mach. Workers* v. *Hudson*, 295 Ark. 107, 747 S.W.2d 81 (1988), *quoting Ross* v. *Ark. Communities*, 258 Ark. 925, 529 S.W.2d 876 (1975). However, the party seeking certification must also show that the class action is superior to individual remedies. *Id.* Here, due to the large number of issues which are individual to each prospective class member, class certification is not superior to individual actions. In short, under the circumstances in this case, we hold that the trial court abused its discretion in ordering certification.

## III. Conclusion

Granted, we have held that a trial court has broad discretion to allow or disallow an action to proceed as a class action. *Summons* v. *Missouri Pac. R.R., supra, International Union of Electrical, Radio and Machine Workers* v. *Hudson, supra.* While our approach taken recently to questions of class action certification has been described as liberal[2], we have not held that a trial court's discretion is so broad that it cannot be the subject of proper review. *See Summons* v. *Pac. R.R., supra.*

On the record before us, we have no hesitation in holding

---

[2]See Kenneth S. Gould, *New Wine in an Old Bottle — Arkansas's Liberalized Class Action Treatment Procedure — A Boon to the Consumer Class Action?*, 17 U. Ark. Little Rock L.J. 1 (1994).

that the trial court abused its discretion in allowing Mr. Hicks's testimony, and in subsequently ordering certification. In so holding, we dissolve the temporary stay and reverse and remand the trial court's order with instructions to decertify the class.

Special Justice BRUCE T. BULLION joins in this opinion.

Special Justice ERNIE E. WRIGHT concurs in part and dissents in part.

NEWBERN, GLAZE, BROWN, and ROAF, JJ., not participating.

ERNIE E. WRIGHT, Special Associate Justice, concurring in part, dissenting in part. I concur in the majority opinion reversing the judgment of the trial court certifying this case as a class action; however, I disagree with its holding that the trial court abused its discretion in allowing Mr. Hicks, an attorney for the appellees, to testify at the pretrial proceeding on the procedural issue of whether the case should be certified as a class action. The word "pretrial" suggests proceedings preliminary to the trial itself, which normally refers to a trial on the merits.

Mr. Hicks's testimony was not before the jury in a trial of the case on its merits, as it was offered and received by the trial court only on the procedural issue. I believe an appropriate application of Rule 3.7 is to construe it as applicable to testimony at trial of a case on its merits or incident to final disposition of the case, such as in summary judgment. There is substantial authority supporting this view. *See Kapco Mfg.* v. *C & O Enter.*, 637 F. Supp. 1231 (N.D. Ill. 1985); *Mobley* v. *Harmon*, 313 Ark. 361, 854 S.W.2d 348 (1993); *Parker* v. *State*, 271 Ark. 84, 607 S.W.2d 378 (1980); and *Henry* v. *Eberhard*, 309 Ark. 336, 832 S.W.2d 467 (1992).

In *Mentor Lagoons, Inc.* v. *Rubin*, 510 N.E.2d 379 (Ohio 1987), the Ohio Supreme Court reversed the trial court for refusing to allow the attorney for a party to testify on the ground that it might be in violation of the Code of Professional Responsibility. The court stated that the rule does not go to the competency of the testimony and that the trial judge must determine the competency of the testimony without reference to the disciplinary rule.

The federal courts, in dealing with the model rule, look with

disfavor upon an attorney testifying on behalf of his client; however, they do not construe the rule as going to the competency of the testimony. *See* 9 A.L.R. Fed. 500-525. In the case of *United States* v. *Morris*, 714 F.2d 669 (7th Cir. 1983), the Seventh Circuit held that the district court did not abuse its discretion in allowing the attorney for the defendant to testify at a pretrial suppression hearing.

The trial judge has considerable discretion regarding the admission of evidence, and, on appeal, when the appellant fails to establish that the attorney's testimony prejudiced him, the admission of the testimony is not a ground for reversal. *In Re Marriage of Lee*, 481 N.E.2d 1045 (Ill. App. 1 Dist. 1985). In Arkansas, the rule on appellate review is in accord, as this court does not reverse absent a showing of prejudice. *Peters* v. *Pierce*, 314 Ark. 8, 858 S.W.2d 680 (1993); *Arkansas Public Service Comm'n* v. *Yelcot Tel. Co.*, 266 Ark. 365, 585 S.W.2d 362 (1979).

It is clear that the majority has concluded that the order certifying the class should be reversed on grounds other than Mr. Hicks's testimony. It follows that the admission of the testimony is not properly included as a ground for reversal. While there may well be some question as to the propriety of attorney Hicks testifying, I do not view the action of the trial judge in allowing the testimony as an abuse of discretion or as any ground for reversal.